## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

JPM-RDP FARMS, LLC, a Florida
corporation

        Petitioner,

v.                                   Case No:   2:17-cv-85-FtM-99CM

UNITED STATES DEPARTMENT
OF AGRICULTURE-RISK
MANAGEMENT AGENCY,
FEDERAL CROP INSURANCE
CORPORATION,

        Defendant.

_____

## REPORT AND RECOMMENDATION[1]

    This matter comes before the Court upon review of Petitioner JPM-RDP Farms, LLC's ("JPM") Motion for Summary Judgment (Dispositive Motion) (Doc. 22) and Respondent United States Department of Agriculture ("USDA"), Risk Management Agency's ("RMA" or "agency") Response in Opposition to Petitioner's Motion for Judgment on the Administrative Record and Cross-Motion to Uphold the RMA's Final Agency Determination (Doc. 26). JPM filed a reply to the RMA's response after obtaining leave of Court. Docs. 28, 29. For the reasons discussed

---

[1] A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

herein, the Court recommends that summary judgment be granted in favor of the RMA.

This is judicial review of a final agency decision denying crop insurance indemnity claims.   In 2015, JPM filed crop insurance claims, seeking indemnity for its losses for fresh market tomato crops under the crop insurance policy reinsured by the Federal Crop Insurance Corporation ("FCIC").   Tr. 5, 89.[2]   On July 22, 2015, the RMA denied JPM's indemnity claims.   Tr. 5-17.   On August 18, 2015, JPM appealed the RMA's decision to the USDA National Appeals Division ("NAD").   Tr. 27-35. JPM received three in-person hearings before the NAD's Administrative Judge ("AJ"), Alisa M. Tapia.   Tr. 61, 72, 75.   On August 5, 2016, the AJ issued a decision holding that the RMA's decision was erroneous.   Tr. 89-107.   The RMA and JPM requested review of the AJ's decision by the Director of the NAD.   Tr. 109-17, 121-35.   On February 1, 2017, Director Steven C. Silverman reversed the AJ's decision and reinstated the RMA's decision denying JPM's indemnity claims, which is the final determination of the agency.   Tr. 140-56; *see* 7 U.S.C. §§ 6998(b), 6999.   On February 8, 2017, JPM filed a Petition for Judicial Review with this Court, seeking judicial review of the agency's decision.   Doc. 1.

---

[2] The RMA electronically filed a complete copy of the administrative record in CM/ECF.   Doc. 18 at 1.   The transcript page numbers ("Tr.__") in this Report and Recommendation refers to the Bates numbers the RMA assigned to each page of the record. *Id.*

## I.    Agency Determination Process

The FCIC is a wholly-owned government corporation within the USDA that administers the federal crop insurance program through the RMA.   7 C.F.R. § 400.701.   The RMA is an "agency within USDA that is authorized to administer the crop insurance program on behalf of FCIC."   *Id.*   Under the federal crop insurance program, the FCIC reinsures private crop insurance indemnifying farmers' covered crop losses.   7 U.S.C. § 1502(b)(2); *Spring Creek Farming Co. v. Fed. Crop. Ins. Corp.*, 653 F. App'x 728, 730 (11th Cir. 2016).

The FCIC enters into Standard Reinsurance Agreements ("SRA") with private insurance companies under which the FCIC reinsures private crop insurance.   7 C.F.R. § 400.164.   The SRA requires a private insurer to follow various mandates, such as using "contracts, standards, FCIC procedures, methods, and instructions as authorized by FCIC in the sale and service of eligible crop insurance contracts." USDA, SRA § IV (f)(1)(C) (2015); 7 C.F.R. § 400.168.   As to the administration of crop insurance, if there is any conflict between the Federal Crop Insurance Act ("FCIA"), 7 U.S.C. § 1501 *et seq.*, the regulations and the FCIC procedures, the order of priority is: (1) the FCIA, (2) the regulations and (3) the FCIC procedures.   7 C.F.R. § 457.8.

To qualify for the FCIC's reinsurance, the terms of the private crop insurance policy must comply with the FCIA and its accompanying regulations.   *Davis v. Producers Agr. Ins. Co.*, 762 F.3d 1276, 1284 (11th Cir. 2014).   The FCIA "generally establishes the terms and conditions of insurance [by regulations], even though the crop insurance policy is between the farmer and an approved insurance provider."

*Id.* (internal quotation marks and footnote omitted).   Accordingly, the contracts of private crop insurance reinsured by the FCIC contain the same terms and conditions as set out in the regulations.   7 C.F.R. § 457.2(b).

Likewise, the regulations provide the provisions of two crop insurance policies for tomatoes: the fresh market tomato ("Dollar Plan") policy, the policy at issue here, and the Guaranteed Production Plan of Fresh Market Tomato Crop Insurance ("Guaranteed Production Plan").   *Id.* §§ 457.128, 457.139; Tr. 97, 145.   The Dollar Plan policy's guarantee is based on a certain dollar amount per acre whereas the Guaranteed Production Plan's guarantee is based on a farmer's past production.   7 C.F.R. §§ 457.128, 457.139; *see* Doc. 26 at 4.

The Dollar Plan policy covers only specified causes of loss during the insurance period, such as excess rain, fire, freeze, hail, tornado and tropical depression.   7 C.F.R. § 457.139.   The policy defines excess rain as "[a]n amount of precipitation sufficient to directly damage the crop."   *Id.*   The policy does not insure against any loss of production caused by disease or insect infestation, "unless no effective control measure exists for such disease or insect infestation."[3]   *Id.*   In contrast, the Guaranteed Production Plan provides coverage for crop losses caused by "[i]nsects, but not damage due to insufficient or improper application of pest control measures," and "[p]lant disease, but not damage due to insufficient or improper application of disease control measures."   7 C.F.R. § 457.128.

---

[3] As discussed later in this Report, it is this latter provision of the policy that is the primary disputed issue here.

Separate procedures govern a large claim ("LC") for indemnity, which indicates a potential claim with an indemnity in excess of $500,000.   USDA, LC Standards Handbook, Ex. 2 (2015).[4]   Pursuant to the SRA, a private insurer must comply with all provisions of the FCIC's LC Procedures.   USDA, SRA Appendix I § IV (2015). According to these procedures, if a private insurer receives a potential LC, the insurer must immediately notify the RMA.   USDA, LC Standards Handbook, Part 4. B (2015).   The RMA, as it did here, may choose to participate in loss adjustment of the LC.   *Id.*, Part 4. D.   The FCIC through the RMA may decide to "provide for adjustment and payment of claims for losses."   7 U.S.C. § 1508(j)(1).

If the RMA issues an adverse decision, a participant must exhaust administrative remedies before seeking judicial review of that decision.   7 C.F.R. § 400.96.   The participant first must appeal the agency decision to the NAD.   *Id.* The NAD Hearing Officer then conducts hearings and reviews the agency record and the evidence submitted by the parties pursuant to the regulations.   *Id.* § 11.8.   Once the Hearing Officer issues a decision, an appellant may seek review of the decision by the Director of the NAD.   *Id.* § 11.8(f).   The appellant must submit a request for the Director's review within 30 days of the Hearing Officer's decision.   *Id.* § 11.9(a)(1).   The Director reviews the Hearing Officer's decision to determine whether it is supported by substantial evidence.   *Id.* § 11.9(d)(1).   The Director then issues "a final determination notice that upholds, reverses, or modifies the determination of

---

[4] This handbook provides the RMA's official standards and procedures for the agency's participation in LCs.   USDA, LC Standards Handbook, Part 1. A. (2015).

the Hearing Officer." *Id.*   Any federal court of competent jurisdiction may review and enforce the NAD's final decision.   *Id.* § 11.13(a).

In issuing their decisions, the Hearing Officers and the Director are not bound by previous findings of facts on which the agency's adverse decision was based.   *Id.* § 11.10(a).   Instead, the Hearing Officers and the Director must ensure that their determinations on appeal are "consistent with the laws and regulations of the agency, and with the generally applicable interpretations of such laws and regulations."   *Id.* § 11.10(b).

## II.   Facts

The following facts set forth by the AJ and the Director are not contested by the parties on appeal.   Docs. 22 at 4-9, 26 at 12-15, 20; *see* Tr. 91-97, 141-44.   JPM is a farming entity that produces fresh market tomatoes in Hendry County, Florida. Tr. 91, 141.   JPM uses crop-scouting services to monitor its crops.   Tr. 91, 141. Between November 2014 and March 2015, scouts visited JPM's farms twice weekly and created reports after inspecting JPM's crops and evaluating the occurrence and severity of insects and diseases on the crops.   Tr. 91, 141, 189-229.

At issue here are two crop diseases: Late Blight and Tomato Yellow Leaf Curl Virus ("Yellow Leaf").   Late Blight is a fungus disease transmitted and spread by silverleaf whiteflies.   Tr. 92, 141 n.1.   The weather conditions favorable to the spread of Late Blight are a combination of fog, rainfall, high humidity and cool temperatures, which leave water on the leaf.   Tr. 92, 141 n.1.   Yellow Leaf is a plant disease transmitted and spread by silverleaf whiteflies that move from farm to farm

and field to field.   Tr. 1751.   Yellow Leaf halts crop growth and causes the leaves to curl.   Doc. 26 at 12; Tr. 1750.   Measures to control Late Blight and Yellow Leaf include the use of pesticides, fungicides and insecticides as well as other non-restricted chemicals.   Tr. 92, 141 n.1.   Control measures may not be effective if the leaves remain wet for an extended period of time due to unfavorable weather conditions.   Tr. 92, 141 n.1.

Scouts' reports from November 2014 to March 2015 showed Late Blight and Yellow Leaf spreading to JPM's tomatoes.   Tr. 189-229.   In a December 5, 2014 report, in the box marked "Virus Symptoms," a scout wrote "TOSPO virus/TYLCV,"[5] and indicated the rate of infection as generally being less than 1% of the crops throughout JPM's farm.   Tr. 197.   The infection level of Late Blight was rated as zero on a scale of zero to five, zero meaning a negligible level of infection and five noting a high level of infection.   *Id.*   By February 24, 2015, in certain areas of JPM's farm, the level of Yellow Leaf infection ranged from 70 to 100% of the crops in those areas.   Tr. 217.   Late Blight also spread to JPM's crops, and the Late Blight infection level increased from zero to three.   *Id.*

JPM purchased the Dollar Plan policy for 259.90 acres of tomatoes for the 2015 crop year[6] from Rural Community Insurance Services (the "Insurance Company").   Tr. 141.   Between January and March 2015, JPM filed three notices of loss with the

---

[5] TYLCV indicates Tomato Yellow Leaf Curl Virus.   Tr. 1751; Doc. 26 at 13.

[6] Crop year is defined as "a period of time that begins on the first day of the earliest planting period for fall planted tomatoes and continues through the last day of the insurance period for spring planted tomatoes.   The crop year is designated by the calendar year in which spring planted tomatoes are harvested."   7 C.F.R. § 457.139.

Insurance Company, reporting that excess rain and freeze caused its crop failure. Tr. 6, 183.   On January 15, 2015, JPM reported to the Insurance Company's loss adjuster, Bill Enneking, that "the cold wet weather in January [2015] has spurred virus and bacteria" in JPM's farm.   Tr. 473.   On February 24, 2015, JPM again reported "bacteria [present] due to fog and rainfall almost from the start of growing season."   Tr. 474.   A field inspection and appraisal of JPM's farm dated January 15, 2015 also documented the presence of bacteria at that time.   *Id.*   Enneking's report dated April 6, 2015 indicated, "[d]ense fog was reported repeatedly over the winter months as many as 40 days since October 15[,] 2014 through February [2015,] and the presence of confirmed [L]ate [B]light as well as freeze event[s] were noted as major factors in the poor conditions of the first age of spring planting and the preceding winter planted tomatoes."   Tr. 478.   As a result, Enneking noted on April 21, 2015, "[n]o marketable fruit [was] found" on JPM's farm.   Tr. 479.

Given the large quantity of JPM's claimed crop losses, the Insurance Company notified the RMA of JPM's claims.   Tr. 474.   The RMA decided to participate in the loss adjustment of JPM's indemnity claims for the crop losses in the 2015 crop year. Tr. 1640.   On July 22, 2015, the RMA issued a decision denying JPM's claims because the agency "determined [JPM's] tomato crop was damaged by disease, an uninsured cause of loss; therefore, there is no payable indemnity for [JPM's] 2015 crop year fresh market tomato claim."   Tr. 5-17.   On August 17, 2015, JPM appealed the agency's decision to the NAD.   Tr. 24-25.

### III.   AJ's Decision

The parties received three in-person hearings before the NAD's AJ on November 10, 2015, December 10, 2015 and January 20, 2016.   Tr. 61, 72, 75.   JPM and the RMA presented the testimony of various witnesses during these hearings. Tr. 1593-2170.   On August 5, 2016, the AJ issued a decision finding the RMA's decision was erroneous.   Tr. 89-107.

The AJ held, among other things, that the RMA did not consider all the facts in concluding that JPM's primary causes of loss were not insured.   Tr. 97-98.   The AJ found the RMA dismissed important facts, such as "excess rain, excess moisture, and other weather events that came before the onset of disease on [JPM's] farm," and the expert opinion that the weather conditions caused the onset of disease and rendered JPM's disease control measures ineffective.   Tr. 97-98.   The AJ further held the RMA dismissed the expert opinion of JPM's crop scouts, although the scouts reviewed JPM's farm records.   Tr. 98.

Furthermore, the AJ determined the rainy weather conditions made JPM's use of recognized and accepted control measures for Late Blight and Yellow Leaf less effective.   Tr. 98.   In support, the AJ relied on the provision of the RMA's Loss Adjustment Manual:[7]

---

[7] The Loss Adjustment Manual is the RMA's official publication "for all levels of insurance provided under the Federal Crop Insurance program unless a specific crop (or commodity) loss adjustment standards handbook (LASH) or insurance standards handbook or guide for a specific plan of insurance . . . specifies that none or only specified parts of this handbook apply."   USDA, Loss Adjustment Manual Standards Handbook, § 1.A. (2014).   It identifies standards, among other things, for general, "not crop-specific" loss adjustment. *Id.* § 1.D(1).

> Loss due to the failure of the insured to take adequate measures to control insects, plant disease, or weeds when such measures are practical and have proven effective in the area is AVOIDABLE and is an UNINSURED cause of loss. However, if the insured carried out recognized and accepted measures to control insects or plant disease . . . or weeds, these causes are considered UNAVOIDABLE INSURED CAUSES. . . . The Agency will consider the damage caused by an uninsured cause of loss as insured IF recognized and accepted control measures were used, and if adverse weather directly caused the control measures to be less effective.

Tr. 98 (emphasis in original); *see* USDA, Loss Adjustment Manual Standards Handbook, § 281.A. (2014).   Here, the AJ found "[JPM] responded promptly with the appropriate fungicides to control [L]ate [B]light but despite this, [JPM] was unable to control the disease due to the weather conditions."   Tr. 99.   The AJ determined "the rainy weather conditions made [JPM's] use of control measures ineffective causing disease to spread over its tomato crop."   *Id.*   Based on the findings above and in her decision, the AJ concluded JPM met its burden to prove that the RMA's adverse decision was erroneous by a preponderance of the evidence.   Tr. 102.   Both the RMA and JPM requested review of the AJ's decision by the Director of the NAD. Tr. 109-17, 121-35.

## IV.   Director's Decision

On February 1, 2017, the Director reversed the AJ and reinstated the RMA's decision denying JPM's insurance claims.   Tr. 140-56.   As summarized by the Director, the key issue on appeal was:

> the proper legal interpretation of the Causes of Loss provisions for the [Dollar Plan] insurance policy codified at 7 C.F.R. § 457.139. Among the covered causes of loss for fresh market tomatoes under the Dollar Plan are excess rain and freeze. 7 C.F.R. § 457.139, Para. 11(a)(l) and (3). Among the causes of loss excluded by these provisions are disease or

insect infestation, *unless no effective control measure exists* for such disease or insect infestation. *Id.* at § 11 (b)(1) (emphasis added).

Tr. 148 (emphasis in original).

The RMA argued to the Director, in part, that JPM's crop losses were caused by disease, an uninsured cause of loss.   Tr. 145.   The RMA asserted the AJ erred by reversing the RMA's decision because she relied on the provision of the RMA's Loss Adjustment Manual and disregarded the actual provisions of JPM's crop insurance policy, the latter of which controls.   *Id.*   JPM responded the AJ correctly applied the laws and regulations of the RMA.   Tr. 146.   JPM first contended its crop losses were covered under the provisions of the Dollar Plan policy because the weather conditions *rendered ineffective* control measures for the disease and insect infestation.   *Id.* JPM further argued excess rain caused its crop losses by creating an environmental condition conducive to the spread of the disease.   Tr. 148.

The Director first considered whether JPM's crop losses were caused by excess rain and determined they were not.   Tr. 149-50.   The Director focused on the Dollar Policy plan's definition of excess rain, which is "[a]n amount of precipitation sufficient to directly damage the crop."   Tr. 149; *see* 7 C.F.R. § 457.139.   Based on this definition, he concluded, "it is reasonable for RMA to cover only those claims in which an insured party is able to establish that it suffered crop losses *directly* as a result of excess rain in the absence of any intervening cause that is not identified in the policy." Tr. 150 (emphasis added).

The Director found that JPM's causes of its crop losses were not "excess rain" as defined in the Dollar Plan policy because excess rain did not *directly* harm JPM's

- 11 -

crops, but instead *indirectly* contributed to JPM's crop losses by creating the environment conducive to the spread of crop disease.   Tr. 149-50.   The Director held "a unique combination of rain, dense fog, humidity, and dew that contributed to the onset and spread of [L]ate [B]light and [Yellow Leaf] in [JPM's] crops."   Tr. 149. Furthermore, he noted not simply large amounts of rain, but the timing and persistence of rain, contributed to an environment conducive to the spread of disease. *Id.*   Thus, the Director found this "indirect" relationship between the weather condition and the crop losses does not qualify for coverage under the Dollar Plan policy.   Tr. 150.

Next, the Director considered whether JPM's claims qualify for coverage under the Dollar Plan policy's provision that excludes coverage for disease or insect infestation, "unless no effective control measure exists for such disease or insect infestation."   *Id.*; 7 C.F.R. § 457.139.   As the Director found, the parties agreed "that disease played at least some role, if not the primary role, in causing [JPM's] crop losses."   Tr. 150 n.10.   But the parties disputed the legal interpretation of the policy provision to determine whether an "effective control measure" for Late Blight and Yellow Leaf existed.   Tr. 148, 150-51.

The RMA argued once an effective control measure is available for a type of disease or insect infestation, the measure always exists, and a disease for which the measure exists could never be an insurable cause of loss.   Tr. 150.   In contrast, JPM focused on the word "effective."   Tr. 150-51.   JPM contended disease or insect infestation is an insurable cause of loss if a control measure becomes ineffective due

to individual circumstances.   *Id.*   In support, JPM relied on the rulemaking history of the provision at issue and the representations made to JPM by a RMA representative and Enneking on April 6, 2015.   Tr. 151.   JPM alleged the representative and Enneking stated "damage due to diseases could be considered an insurable loss if the control measures were rendered ineffective due to weather events so long as good farming practices were followed."   *Id.*

The Director agreed with the RMA's interpretation of the provision at issue. Tr. 150-53.   He held the rulemaking history of the provision supports the RMA's interpretation.   Tr. 151.   He also upheld the RMA's argument that Enneking's and the representative's representations were the result of confusing the Dollar Plan policy with the Guaranteed Production Plan.   Tr. 151-52.   The Director found that in contrast to the Dollar Plan policy, the Guaranteed Production Plan "allows coverage for insects and diseases unless insufficient or improper application of control measures were used."   Tr. 152.   The Director further held the provision of the Loss Adjustment Manual discussed by the AJ provides guidance on causes of loss involving insects and disease under the Guaranteed Production Plan policy, as opposed to the Dollar Plan policy at issue here.   *Id.*

Based on these findings and interpretations above, the Director determined "the record in this case establishes that control measures exist for the diseases that damaged [JPM's] crops; thus, the applicable standard for an insurable cause of loss under the Dollar Plan has not been met."   Tr. 153.   The Director did not consider

the parties' other arguments.   *Id.*   The Director reversed the AJ's decision and reinstated the RMA's decision denying JPM's claims.   Tr. 154.

## V.   Standard of Review[8]

Federal courts review the NAD's final determination under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*   7 U.S.C. § 6999.   The Act allows federal courts to set aside agency decisions when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).; *see Spring Creek Farming*, 653 F. App'x at 731.   This requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action."   *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted).   The arbitrary and capricious standard is "exceedingly deferential," and allows courts "very limited discretion to reverse an agency decision."   *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996); *United States v. Dean*, 604 F.3d 1275, 1278 (11th Cir. 2010) (citation and internal quotation marks omitted).   A court is only "to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision."   *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (citation and internal quotation marks omitted); *Spring Creek Farming*, 653 F. App'x at 731.

A court decides whether the agency's factual findings are "unsupported by substantial evidence."   5 U.S.C. § 706(2)(E).   "The substantial evidence test is no

---

[8] The parties stipulated to the standard of review.   Doc. 21.

more than a recitation of the application of the 'arbitrary and capricious' standard to factual findings." *Fields v. U.S. Dep't of Labor Admin. Review Bd.*, 173 F.3d 811, 813 (11th Cir. 1999) (citation omitted).   Substantial evidence indicates "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stone & Webster Const., Inc., v. U.S. Dep't of Labor*, 684 F.3d 1127, 1133 (11th Cir. 2012) (citation omitted).   This standard prevents the court from "deciding the facts anew, making credibility determinations, or re-weighing the evidence." *Id.* (citation omitted).   It is not enough that the record may support a contrary conclusion to merit reversal.   *DeKalb Cnty. v. U.S. Dep't of Labor*, 812 F.3d 1015, 1020 (11th Cir. 2016).   On the other hand, courts review the agency's legal conclusions *de novo.   Id.* (citation omitted).

In addition, "[t]he court must also give deference to the agency's interpretation of its rules and regulations as long as that interpretation is not 'plainly erroneous' or 'inconsistent with the regulation.'"   *Dawson Farms v. Risk Mgmt. Agency*, No. 3:09-cv-67, 2011 WL 3862195, at *5 (D.N.D. Aug. 31, 2011) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *see* Doc. 21 at 2.   "The more technical and complex the regulatory area is, the more the courts defer to the expertise of the agency as a matter of public policy."   *Dawson Farms*, 2011 WL 3862195, at *5 (citing *Thomas Jefferson Univ.*, 512 U.S. at 512).

## VI.   Analysis

### a. *Scope of Director's review*

JPM first contends the Director exceeded his scope of review when he determined, "it is reasonable for RMA to cover only those claims in which an insured party is able to establish that it suffered crop losses directly as a result of excess rain in the absence of any intervening cause that is not identified in the policy," and excess as defined in the Dollar Plan policy did not cause JPM's crop losses.   Doc. 22 at 12-14.   JPM argues the AJ is the trier of fact whose findings are entitled all credibility inferences, and the scope of the Director's review is limited to determining whether the AJ's decision is supported by substantial evidence.   *Id.* at 13-14.   JPM asserts that instead of reviewing the AJ's decision under the substantial evidence standard, the Director independently interpreted the facts and reached the erroneous conclusion.   *Id.* at 12-14.   The RMA responds the reversed portions of the AJ's findings were legal considerations, not factual findings, and the Director need not accept the AJ's legal conclusions.   Doc. 26 at 19-20.

The Court recommends the Director did not exceed his scope of review in concluding that excess rain did not cause JPM's crop losses.   JPM correctly argues the Director did not dispute the AJ's factual findings.   Doc. 22 at 12; Tr. 140-44. Instead, as JPM concedes, the Director considered the legal interpretation of the Dollar Plan policy's provision: whether "excess rain" as defined in the policy caused JPM's crop losses.   Doc. 22 at 12; *see* 7 C.F.R. § 457.139; Tr. 148.   The Director interpreted the definition of excess rain to conclude that, "it is reasonable for RMA to

cover only those claims in which an insured party is able to establish that it suffered crop losses *directly* as a result of excess rain in the absence of any intervening cause that is not identified in the policy." Tr. 150 (emphasis added). After analyzing the evidence of record, the Director determined JPM's weather conditions did not *directly* harm JPM's crops, and thus the cause of JPM's crop losses was not excess rain as defined in the Dollar Plan policy. Tr. 149-50.

This was an issue of law the AJ did not decide, but the Director determined on appeal. Tr. 97-98, 149-50. The AJ did not consider the definition of excess rain or the application of this definition to this case. Tr. 97-98. Instead, the AJ only decided that the RMA did not consider all the facts in finding JPM's primary causes of crop losses were not insured. Tr. 97-98. On appeal, the Director found JPM argued that excess rain as defined in the policy caused its crop losses. Tr. 148. Accordingly, the Director made a new finding of law by interpreting the definition of "excess rain" and examining the application of the provision to this case. Tr. 148-50. By doing so, the Director was fulfilling his obligation to ensure that his decision is consistent with the laws and regulations of the agency. Tr. 149-50; *see* 7 C.F.R. §§ 11.9(d)(1), 11.10(b). The AJ did not make a relevant legal finding for the Director to review under the substantial evidence standard. Tr. 97-98. Thus, the Court recommends the Director did not exceed his scope of review in deciding that excess rain was not the cause of JPM's crop losses. Tr. 149-50.

### b. *Director's interpretation of the Dollar Plan policy's provision*

As noted, the Director determined:

> the proper legal interpretation of the Causes of Loss provisions for the [Dollar Plan] insurance policy codified at 7 C.F.R. § 457.139. Among the covered causes of loss for fresh market tomatoes under the Dollar Plan are excess rain and freeze. 7 C.F.R. § 457.139, Para. 11(a)(l) and (3). Among the causes of loss excluded by these provisions are disease or insect infestation, *unless no effective control measure exists* for such disease or insect infestation. *Id.* at § 11 (b)(1) (emphasis added).

Tr. 148 (emphasis in original).   After considering the parties' competing interpretations of the phrase "unless no effective control measure exists," the Director upheld the RMA's interpretation that once an effective control measure for a type of disease or insect infestation is developed, such disease or insect infestation no longer qualifies for coverage under this provision.   Tr. 150.   JPM challenges this holding and argues the Director's interpretation contradicts a plain reading of the provision. Doc. 22 at 18.   To rebut this finding, JPM relies on the rulemaking history of the provision and the representations of the RMA's former employee and Enneking.   *Id.* at 17-21.

JPM first refers to the comment the agency received in finalizing the provision at issue.   *Id.* at 18.[9]   On December 30, 1996, the FCIC proposed specific crop provisions for the Dollar Plan policy, which excluded coverage for disease or insect infestation.   Dollar Plan Provisions, 61 Fed. Reg. 68,682-01, 68,686 (proposed Dec. 30, 1996).   In response to this proposed rule, the crop insurance industry submitted

---

[9] The brief cites to Common Crop Insurance Regulations, Fresh Market Tomato (Dollar Plan) Crop Insurance Provisions ("Dollar Plan Provisions"), 62 Fed. Reg. 14,775-01 (Mar. 28, 1997) (to be codified at 7 C.F.R. pt. 401 & 457).

one comment seeking to remove disease and insect infestation as uninsured causes of loss.   Dollar Plan Provisions, 62 Fed. Reg. at 14,777.

The industry "suggested disease and insects should be an insured cause of loss if a producer exhausts all reasonable means to protect the crop.   This would provide coverage for new diseases and insects that cannot presently be controlled by the chemicals that are available."   *Id.*   The FCIC responded "coverage should be available for damage due to disease and insect infestation for which no effective control measure exists."   *Id.*   Accordingly, the FCIC amended the proposed provision to state that disease or insect infestation is not covered, unless "no effective control measure exists for such disease or insect infestation."   *Id.*; *see* 7 C.F.R. § 457.139.

The Director considered the industry's comment and the FCIC's response and found the rulemaking history supports the RMA's interpretation.   Tr. 151.   The Director held that the comment sought to "provide coverage for new diseases and insects that cannot presently be controlled by the chemicals that are available," which the FCIC considered and accepted.   *Id.*   The Director found this history does not support JPM's position that the provision is designed to cover "a loss caused by a disease for which available chemicals were not effective due to specific weather conditions."   *Id.*   JPM argues the agency could not have intended to provide crop insurance coverage only for "new" disease or insect infestation, as suggested by the RMA and the Director.   Doc. 22 at 19.   Instead, the provision, as written, covers all known disease or insect infestation for which an effective control measure does not

exist.   *Id.*   The RMA responds the rulemaking history supports the Director's interpretation.   Doc. 26 at 22-23.

Next, JPM argues that in reaching his decision, the Director overlooked the representations of the RMA's former employee, John Bishop, and Enneking.   Doc. 22 at 19.   On April 6, 2015, Bishop and Enneking informed JPM that "damage due to disease for which control measures exist that is due to weather events making the control measures ineffective is an insurable cause of loss if the producer followed recommended good farming practices."   Tr. 94-95, 478.   The RMA responds Bishop's representation does not bind the agency.   Doc. 26 at 17-18.   JPM asserts the RMA's argument ignores the fact that Bishop was the lead representative of the RMA, who participated in adjudicating JPM's claims.   Doc. 29 at 5-6.

JPM further contests the Director's reliance on *Wagner v. Director, Federal Emergency Management Agency*, 847 F.2d 515 (9th Cir. 1988).   Doc. 22 at 20.   In his decision, the Director held the plain language of the Dollar Plan policy excludes any loss caused by disease, which prevented him from finding in favor of JPM.   Tr. 150 n.10.   In support, the Director cited to *Wagner* for the proposition that "where the insurer exercises its right to limit coverage of risks, the plain language of that limitation must be observed."   *Id.* (citing *Wagner*, 847 F.2d at 522-23).   JPM asserts the Director's reliance on this case is flawed because other case law within this circuit supports construing insurance provisions against the insurer and in favor of coverage. Doc. 22 at 20 (citing *Quesada v. Director, Fed. Emergency Mgmt. Agency*, 753 F.2d 1011 (11th Cir. 1985); *Arawak Aviation, Inc. v. Indem. Ins. Co. of N. Am.*, 285 F.3d 954,

956 (11th Cir. 2002)).   The RMA responds the Dollar Plan policy provides a clear exclusion for a loss caused by disease or insect infestation.   Doc. 26 at 17.

Lastly, JPM discusses the data from the RMA's websites to show that under the Dollar Plan policy, the RMA has provided coverage for crop losses caused by diseases or insect infestations.   Docs. 22 at 21-23, 22-1.   The RMA responds these data are misleading because the data on the website represent only indemnities paid by private insurance companies, not by the RMA.   Doc. 26 at 18 n.10.   The RMA also claims that it has not paid any claims for losses due to Late Blight or Yellow Leaf under the Dollar Plan policy.   *Id.* at 18.   JPM asserts that regardless of which entity pays for indemnity claims, the same standards of loss adjustment and the RMA's close supervision apply to adjudicating all claims.   Doc. 29 at 4.

The Court recommends upholding the Director's interpretation of the Dollar Plan policy.   The issue here is the agency's interpretation of its own regulations, not a question of insurance contract interpretation as characterized by JPM.   *Cf.* Doc. 22 at 19-20.   As noted, the provisions of the Dollar Plan policy are published in the Code of Federal Regulations.   *See* 7 C.F.R. § 457.139.   Thus, the provisions of the crop insurance policy trump any contrary state laws that generally would apply to private insurance contracts.   7 U.S.C. § 1506 (l) ("State and local laws or rules shall not apply to contracts, agreements, or regulations of the [FCIC] or the parties thereto to the extent that such contracts, agreements, or regulations provide that such laws or rules shall not apply, or to the extent that such laws or rules are inconsistent with such contracts, agreements, or regulations."); *Nobles v. Rural Cmty. Ins. Serv.*, 122

F. Supp. 2d 1290, 1294 (M.D. Ala. 2000).   The FCIC also determines interpretations of the FCIA and regulations.   7 C.F.R. §§ 400.765, 457.8 ("[I]f the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, either you or we must obtain an interpretation from FCIC. . . .").

Accordingly, the Court must give "substantial deference" to the RMA's interpretation of the Dollar Plan policy because it is the agency's interpretation of its own regulation.   *Thomas Jefferson Univ.*, 512 U.S. at 512 (citations omitted).   The United States Supreme Court made clear:

> Our task is not to decide which among several competing interpretations best serves the regulatory purpose.   Rather, the agency's interpretation must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation."   In other words, we must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." This broad deference is all the more warranted when . . . the regulation concerns "a complex and highly technical regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns."

*Id.* (citations omitted).

Courts defer to an agency's interpretation of its own regulations, even in a legal brief, "unless the interpretation is 'plainly erroneous or inconsistent with the regulations' or there is any other 'reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'"

*Talk Am. Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 59 (2011) (alteration in original) (citations omitted).   "It is irrelevant that the [agency's] interpretation comes to [the court] in the form of a legal brief[.   T]hat does not . . . make it unworthy of deference." *Ramos-Barrientos v. Bland*, 661 F.3d 587, 596 (11th Cir. 2011) (alteration in original) (internal quotation marks and citations omitted).   Similarly, if the agency proposes a new interpretation of its regulation, "novelty alone is not a reason to refuse deference." *Talk Am.*, 564 U.S at 64.   On the other hand, reasons to suspect the agency's interpretation may exist if the agency's position is its appellate counsel's *post-hoc* rationalization advanced to defend past agency action.   *See id.*

The Court recommends applying this deferential standard of review because the Dollar Plan policy's provisions at issue here are not simply a "'paraphrase [of] the statutory language' that [the agency] should be implementing." *Sierra Club v. Johnson*, 436 F.3d 1269, 1274 (11th Cir. 2006) (citation omitted); *see* 7 C.F.R. § 457.139.   This deferential standard of review compels the Court to uphold the agency's interpretation of its regulations "so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." *Id.* (citation omitted).   The agency's interpretation need not be "the best or most natural one by grammatical or other standards." *Id.* (citations and internal quotation marks omitted).

First, the Court recommends the Director's interpretation of the Dollar Plan policy's provision is not plainly erroneous or inconsistent with the regulations.   Tr. 140-56; *see Talk Am.*, 564 U.S at 59; *Bland*, 661 F.3d at 596.   The Director's

interpretation is consistent with the regulatory texts, as explained in the decision. Tr. 150-53.   The Dollar Plan policy does not define what "effective control measure" means and when it exists for certain types of disease or insect infestation.   7 C.F.R. § 457.139.   Accordingly, the Director interpreted the policy's provision in light of the rulemaking history and other crop insurance policies.   Tr. 150-53.   The Director reasonably and properly considered the crop industry's comment to the proposed regulation, which demanded coverage for new diseases and insects, and the existence of another crop insurance policy providing coverage for insects and diseases.   Tr. 151-53; see *Bland*, 661 F.3d at 597-98; *Sierra Club*, 436 F.3d at 1274.

To refute the Director's analysis, JPM submits legal authority on the interpretation of ordinary insurance contracts, which, as noted, does not govern the agency's interpretation of its own regulations.   Doc. 22 at 20.   Thus, JPM does not show that the Director's legal interpretation of the provision contradicts statutory and regulatory texts or courts' earlier interpretations of the provision at issue.   *See Bland*, 661 F.3d at 597 (finding the agency's interpretation of the regulation was not plainly erroneous or inconsistent with the regulation because the agency's "position is consistent with statutory and regulatory texts and [courts'] earlier interpretations of those provisions.").

The Court further recommends that JPM does not present sufficient reasons to question the RMA's interpretation of its own regulations.   JPM first relies on the representations of Bishop and Enneking, which do not bind the RMA.   Docs. 22 at 19, 29 at 5-6.   The regulations provide the order of priority to resolve conflicts

between insurance provisions and legal authority, which does not include any representations of the agency's employees.   7 C.F.R. § 457.8.   In fact, as the RMA correctly contends, Bishop, as the RMA's former employee, may not modify or waive the provisions of Dollar Plan policy unless the policy authorizes a waiver or modification by written agreement.   *See id.*; Doc. 26 at 17.   There is no evidence that the Dollar Plan policy authorizes a waiver or modification by written agreement, and the RMA argues it did not authorize any waiver or modification.   7 C.F.R. § 457.139; Doc. 26 at 17.

JPM also asserts the RMA in the past has provided indemnity for crop losses caused by disease or insect infestation under the Dollar Plan policy, and so it should do so here.   Docs. 22 at 21-23, 29 at 2-5.   But again, the RMA's past practice does not preempt regulations or the FCIC procedures.   *See* 7 C.F.R. § 457.8. Furthermore, the data submitted by JPM do not support its position that its indemnity claims are insurable.   Doc. 22-1.   As the RMA correctly argues, the data do not show that the Dollar Plan policy has covered crop losses caused by disease or insect infestation, as here, for which an effective control measure exists, but simply that the policy has covered losses caused by unspecified disease or insect infestation. Docs. 22-1, 26 at 18-19.

Given the findings above, under the deferential standard of review, the Court recommends upholding the Director's interpretation of the Dollar Plan policy because the Court "cannot conclude that the [Director's] interpretation here is unreasonable." *Li Shan Chen v. U.S. Atty. Gen.*, 672 F.3d 961, 965 n.2 (11th Cir. 2011) ("The

[agency's] interpretation of its own regulations is entitled to deference as long as it is 'reasonable'—as opposed to 'plainly erroneous'—and not inconsistent with the will of Congress or the text of the regulation itself. . . . We cannot conclude that the [agency's] interpretation here is unreasonable.").

Finally, JPM relies heavily on the AJ's decision, although the determination of the Director, not of the AJ, is the RMA's final decision before the Court.[10]   Docs. 22 at 23-24, 26 at 19; *see* 7 C.F.R. § 11.9(d)(1).   When the Director disagrees with the AJ, a court reviews the Director's decision "'more critically,' but ultimately, the decision is [the Director's] so long as the [the Director] supports [his] decision with 'articulate, cogent, and reliable analysis.'"   *Stone & Webster Const.*, 684 F.3d at 1132 (citation omitted).   Here, the Court's review of the Director's decision reveals that he has provided an articulate, cogent and reliable analysis as required.   Tr. 140-56; *see id.*

In its motion for summary judgment, JPM also requests oral argument.   Doc. 22 at 25.   Given the findings and recommendations herein, the Court recommends denying JPM's request for oral argument because oral argument is not necessary to explain the parties' positions and does not aid judicial resolution of the present motions.   *See id.*

---

[10] The Court does not consider JPM's arguments regarding other issues, such as damages and good farming practices, because the Director did not consider them, and they are not material to the Court's review on appeal.   Doc. 22 at 23-24; Tr. 153.

### VII.    Conclusion

The Court recommends that the final agency decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the Director examined the relevant data, articulated a satisfactory explanation for his decision and came to a rational conclusion.   *See Fox Television Stations*, 556 U.S. at 513; *Sierra Club*, 526 F.3d at 1360.

ACCORDINGLY, it is respectfully

**RECOMMENDED:**

1.    Petitioner's Motion for Summary Judgment (Dispositive Motion) (Doc. 22) be **DENIED**.

2.    Petitioner's Request for Oral Argument (Doc. 22) be **DENIED**;

3.    Respondent United States Department of Agriculture, Risk Management Agency's Response in Opposition to Petitioner's Motion for Judgment on the Administrative Record and Cross-Motion to Uphold the RMA's Final Agency Determination (Doc. 26) be **GRANTED**; and

4.    Judgment be entered in favor of Respondent, and the Clerk be directed to close this file.

**DONE** and **ENTERED** in Fort Myers, Florida on this 8th day of December, 2017.

CAROL MIRANDO
United States Magistrate Judge

Copies:
Counsel of record