UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JPM-RDP FARMS, LLC, a
Florida corporation,

       Petitioner,

v.                                    Case No: 2:17-cv-85-FtM-99CM

UNITED STATES DEPARTMENT OF
AGRICULTURE-RISK MANAGEMENT
AGENCY, FEDERAL CROP
INSURANCE CORPORATION,

       Defendant.

---

**OPINION AND ORDER**

This matter is before the Court on consideration of a Report and Recommendation (Doc. #30), filed on December 8, 2017, recommending that petitioner's Motion for Summary Judgment and Request for Oral Argument (Doc. #22) be denied, and respondent's Cross-Motion to Uphold the RMA's Final Agency Determination (Doc. #26) be granted. Petitioner filed Rule 72(b) Objections (Doc. #31) on December 21, 2017, and the United States filed a Response (Doc. #36) on January 12, 2017.

This case requires the Court to determine whether a government agency properly rejected petitioner's crop insurance claims for the loss of its 2014-15 fresh market tomato crops. The final decision of the agency found the losses were not the result of a covered cause under the insurance policy, and therefore denied

petitioner's claims.  For the reasons set forth below, the final decision of the agency is affirmed.

I.

As discussed below, the Court reviews the Report and Recommendation *de novo* but reviews the final agency decision under deferential standards of review.

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject or modify the magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); United States v. Powell, 628 F.3d 1254, 1256 (11th Cir. 2010).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  See also United States v. Farias-Gonzalez, 556 F.3d 1181, 1184 n.1 (11th Cir. 2009).  This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party." Jeffrey S. v. State Bd. of Educ. of Ga., 896 F.2d 507, 512 (11th Cir. 1990) (quoting H.R. 1609, 94th Cong., § 2 (1976)).  The district judge reviews legal conclusions *de novo*, even in the absence of an objection.  See Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 604 (11th Cir. 1994).

Under the Administrative Procedures Act, 5 U.S.C. § 701 et seq., a federal court shall set aside an agency decision that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A). "The arbitrary and capricious standard is exceedingly deferential." Jones Total Health Care Pharmacy, LLC v. Drug Enf't Admin., 881 F.3d 823, 829 (11th Cir. 2018) (citation omitted). A Court may not substitute its judgment for that of the agency so long as the agency conclusions are rational and based on the evidence before it. Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009). "[E]ven in the context of summary judgment, an agency action is entitled to great deference." Mahon v. U.S. Dep't of Agric., 485 F.3d 1247, 1253 (11th Cir. 2007) (citation omitted).

A court must also consider whether the final agency decision was supported by "substantial evidence" in the record. 5 U.S.C. § 706(2)(E). The substantial evidence test is similar to the arbitrary and capricious standard, but it applies to factual findings. Fields v. Dep't of Labor Admin. Review Bd., 173 F.3d 811, 813 (11th Cir. 1999). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Stone & Webster Constr., Inc. v. United States DOL, 684 F.3d 1127, 1133 (11th Cir. 2012) (citation omitted). The fact that the record may support a contrary conclusion is not enough to undermine the existence of substantial evidence. DeKalb Cty. v. United States DOL, 812 F.3d 1015, 1020 (11th Cir. 2016).

## II.

Enacted in 1938, the Federal Crop Insurance Act (the "Act" or "FCIA"), 7 U.S.C. § 1501 et seq., is designed to "promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance." Id. § 1502(a). To carry out the Act, Congress created the Federal Crop Insurance Corporation ("FCIC"), a government-owned corporation which acts as an "agency of and within the Department" of Agriculture ("USDA"). Id. § 1503. The USDA Office of Risk Management, commonly referred to as the Risk Management Agency ("RMA"), 7 C.F.R. § 400.701, supervises the FCIC and administers all programs authorized under the FCIA. 7 U.S.C. § 6933(a), (b)(1)-(3). One such program is a nationwide crop insurance program. 7 U.S.C. § 1508.

Since 1980, the FCIC both directly insures producers of agricultural commodities grown in the United States and provides reinsurance for private companies which insure such producers. 7 U.S.C. § 1508(a)(1); Williams Farms of Homestead, Inc. v. Rain & Hail Ins. Servs., Inc., 121 F.3d 630, 633 (11th Cir. 1997). This is done "under 1 or more plans of insurance determined by the Corporation to be adapted to the agricultural commodity concerned." 7 U.S.C. § 1508(a)(1). "To qualify for coverage under a plan of insurance, the losses of the insured commodity

must be due to drought, flood, or other natural disaster (as determined by the Secretary)." 7 U.S.C. § 1508(a)(1).

To qualify for reinsurance through the FCIC, the policies must comply with the FCIA and its accompanying regulations. 7 C.F.R. §§ 457.2(b), 457.7. In effect, the FCIA establishes the terms and conditions of such re-insurance policies. A "Common Crop Insurance Policy" standard throughout the industry is used by insurers when the FCIC provides reinsurance. 7 C.F.R. § 457.8. Specific provisions relating to fresh market tomato (Dollar Plan) crop insurance are found at 7 C.F.R. §457.139. See generally Davis v. Producers Agric. Ins. Co., 762 F.3d 1276, 1284-85 (11th Cir. 2014).

### III.

Petitioner purchased crop insurance for the 2015 crop year, and ultimately filed three claims seeking indemnity for losses of its fresh market tomato crops. The FCIC claim determination process is fully described in the Report and Recommendation, which is adopted and incorporated herein. (Doc. #30, pp. 3-6.) The RMA denied the claim; a United States Department of Agriculture National Appeals Division (NAD) Administrative Judge (AJ) reversed the RMA denial; and the Director of NAD subsequently reversed the Administrative Judge's decision and reinstated the RMA decision denying the claims. Petitioner now seeks judicial review of that final agency decision.

## A. Underlying Facts

The Court accepts and adopts the facts as set forth by the Magistrate Judge (Doc. #30, pp. 6-14)[1]. In sum:

Petitioner JPM-RDP Farms, LLC (JPM) is a farming entity that grows fresh market tomatoes in Hendry County, Florida. JPM purchased crop insurance for 259.9 acres of its 2014-15 (2015 crop year) fresh market tomato crops from Rural Community Insurance Service (the "Insurance Company"), an approved insurance provider reinsured by RMA, for a premium in excess of $220,000.00. This is a named peril policy which only covers losses caused by the perils identified in the policy. Between January and March 2015, JPM filed three notices of loss with the Insurance Company, reporting that excess rain and/or freeze caused its tomato crops to fail. JPM asserted that it was entitled to indemnities in excess of $1 million.

JPM uses crop-scouting services to monitor and assess the health of its tomato plants by assessing the occurrence and severity of insects and disease. Between November 2014 and March 2015, scouts visited JPM's farms twice weekly and created written reports as to the health status of the crops and the recommended

---

[1] While most of the record citations are contained in the Report and Recommendation and will not be repeated here, the Court will cite to portions of the administrative record as "AR" followed by the page number. The Administrative Record is found at Doc. #18.

control measures. Beginning December 17, 2014, these reports documented the presence of Late Blight and Tomato Yellow Leaf Curl Virus ("Yellow Leaf") spreading to JPM's tomatoes.

On January 15, 2015, a loss adjuster conducted a pre-harvest appraisal on the first and second ages of the winter crop, and reported that the first age had severe virus affecting over 50% of the plants and the second age planting had less virus and bacteria pressure. On January 16, 2015, scouts detected late blight, and petitioner was advised to use a fungicidal spray rotation of Previcur Flex, Forum, and Curzate to combat its spread. Petitioner continued to spray its fields with protective fungicide products. Due to a high number of days of heavy fog, dew, and frequent rain, the late blight continued to develop on the leaves, reaching medium to high levels.

Between January 19 and February 19, 2015, petitioner conducted two harvests of its winter crop. On the last day of the second harvest, petitioner observed the continued breakdown of the tomatoes and determined that it could not harvest any more of the crop. Petitioner requested permission to destroy the crop, which required the RMA's approval. On February 19, 2015, temperatures at the farm ranged from 28 to 32 degrees Fahrenheit for longer than 5 hours. On February 20, 2015, the scouting report showed moderate sporulation was producing on the first and second age plantings of the winter crop. On February 23, 2015, petitioner

filed a second Notice of Loss of its winter crop due to freeze damage.

A February 24, 2015, scouting report showed that the first age of the winter crop was drying, and there was no sporulation visible. The second age showed active fungus with high sporulation, indicating that new infections were occurring, and there were new lesions and some spread. The scout advised petitioner to continue rotating fungicides, but rainfall hindered petitioner from making applications quickly.

Also on February 24, 2015, the loss adjuster conducted a field inspection and saw yellowing and blanching of the tomatoes, softness, and chlorotic veins. The marketable tomatoes remaining on the vines after two harvests were beyond salvage. Petitioner again requested permission to destroy the crop. Based on the extent of the damage, the loss adjuster contacted the RMA, which elected to participate in the loss adjustment of the claims.

From February to mid-March 2015, a wet weather environment escalated the diseases. Fungus developed on leaves faster and the sprays were not preventing the spread. On March 3, 2015, the RMA issued a certification to destroy the first age of petitioner's winter crop. Additional scouting reports in March showed continued spread of disease in the crops.

On April 6, 2015, the adjuster, a certified crop advisor, and a RMA representative conducted a field inspection. The RMA

confirmed the presence of late blight, Tomato Yellow Leaf Curl Virus, and possible bacterial infection. After inspecting the second age of the spring crop, it was estimated that it would be 100% infected within a week. An RMA official notified petitioner that disease for which control measures exist is not an insurable cause of loss, but that damage due to disease for which weather events make control measures ineffective is an insurable cause of loss if the producer followed recommended good farming practices.

At the end of April 2015, the RMA visited a comparative farm 6 to 10 miles away, and then visited petitioner's farm to conduct post-harvest appraisals of the second and third ages of the spring crop. The RMA found no marketable tomatoes. The certified crop advisor reviewed the scouting reports and spray records. The crop advisor determined that petitioner was unable to control the disease due to the weather conditions, and that petitioner had done everything within its control to conquer the pest pressure, but the combination of diseases was overwhelming and the rainfall played a significant part in the problem. The RMA reviewed the scouting reports and spray records and found that petitioner had not followed the recommended publication guidelines on control measures.

## B. RMA's Denial of Insurance Claims

On July 22, 2015, the RMA issued a decision denying JPM's insurance claims. (AR 5-95.) The RMA determined that the primary

cause for the loss of the winter crop was late blight; the primary cause of the loss for the spring crop was Yellow Curl; effective control measures existed to control both diseases; but that JPM did not follow the recommended guidelines to control these diseases. (AR 6-13.) The RMA concluded that "[JPM's] tomato crop was damaged by disease, an uninsured cause of loss; therefore, there is no payable indemnity for [JPM's] 2015 crop year fresh market tomato claim." (AR 13.)

On August 17, 2015, JPM appealed the RMA's decision to the NAD.

### C. Administrative Judge Decision

An Administrative Judge heard testimony on three days, and on August 5, 2016, issued an Appeal Determination (AR 89-102) finding the RMA's decision was "in error." (AR 90.)

The Administrative Judge stated the issue as whether the RMA had followed its rules and regulations when it denied JPM's indemnity claim for losses to its fresh market tomato crop, and identified six sub-issues. (AR 90-91.) After setting forth Findings of Fact (AR 91-97), the Administrative Judge resolved the six sub-issues she had identified. (AR 97-102.) Specifically, the Administrative Judge held: (1) the RMA had utilized the wrong burden of proof standard, requiring JPM to establish its case <u>beyond</u> a preponderance of the evidence instead of <u>by</u> a preponderance of the evidence; (2) the RMA "cherry-picked"

particular facts and improperly dismissed relevant evidence which supported JPM's contention; (3) rainy weather conditions made the virus conducive to the spread of disease, and made JPM's use of recognized and accepted control measures less effective; (4) JPM promptly requested permission to destroy is first winter plantings to protect adjacent plantings from virus and disease; (5) the RMA did not have a clear understanding of JPM's tomato operation or of the cultural practices and technical aspects of growing fresh farmed tomatoes, and was unclear as to the rules and regulations that applied to JPM's claim; and (6) the RMA failed to select an adequate comparative farm which met the requirements of the Loss Adjustment Manual, and did not comply with the procedures to establish the date of interest to accrue for controversial claims.

The Administrative Judge determined that JPM had met its preponderance of the evidence burden to prove that the RMA's adverse decision was erroneous. (AR 102.)

Both the RMA and JPM requested review of the Administrative Judge's decision by the Director of the NAD. (AR 110-17; 121-35.)

**D. Director's Decision**

On February 1, 2017, the Director Review Determination (AR 139-56) by the Director of the National Appeals Division reversed the Administrative Judge and reinstated the RMA's decision denying JPM's insurance claims because the losses were due to an ineligible cause of loss, i.e., disease. (AR 154.)

The Director stated that the issue on appeal was "whether RMA properly denied Appellant's indemnity claims in connection with its 2015 winter and spring fresh market tomato crops because Appellant's loses were due to an ineligible cause of loss." (AR 139.) The Director reviewed the facts in the record in some detail (AR 139-43), all of which were consistent with the findings of the Administrative Judge. The Director stated that he was tasked with conducting "a review of the Administrative Judge's determination using the entire case record in order to determine if the decision is supported by substantial evidence . . . [and] is consistent with the laws and regulations of the agency, and with the generally applicable interpretations of such laws and regulations." (AR 144.)

On appeal, the RMA argued, among other things, that JPM's crop losses were caused by disease, an uninsured cause of loss, and that the Administrative Judge erred by relying on the provision of the RMA's Loss Adjustment Manual and disregarding the actual provisions of JPM's crop insurance policy. JPM responded, among other things, that the Administrative Judge's decision was consistent with the laws and regulations of the agency and was supported by substantial evidence. JPM asserted that its crop losses were covered under the policy because no effective control measure existed for the disease and insect infestation of the crops at issue. JPM also relied upon the statement of RMA's

representative that the circumstances of these crops could be considered an insurable cause of loss if recommended good farming practices were followed. (AR 144-47.)

The Director stated that the key issue in the case was

> the proper legal interpretation of the Causes
> of Loss provisions for the [Dollar Plan]
> insurance policy codified at 7 C.F.R. §
> 457.139. Among the covered causes of loss for
> fresh market tomatoes under the Dollar Plan
> are excess rain and freeze. 7 C.F.R. §
> 457.139, Para. 11(a)(l) and (3). Among the
> causes of loss excluded by these provisions
> are disease or insect infestation, *unless no
> effective control measure exists* for such
> disease or insect infestation. Id. at § 11
> (b)(1).

(AR 148) (emphasis added in original). The first policy provision cited by the Director provides:

> (a) In accordance with the provisions of
> section 12 of the Basic Provisions, insurance
> is provided only against the following causes
> of loss that occur during the insurance
> period:
>
> (1) Excess rain
>
> . . . .

7 C.F.R. § 457.139, ¶ 11(a)(1). "Excess rain" is defined as "[a]n amount of precipitation sufficient to directly damage the crop." 7 C.F.R. § 457.139, ¶ 1. The second policy provision cited by the Director provides:

> (b) In addition to the causes of loss excluded
> in section 12 of the Basic Provisions, we will
> not insure against any loss of production due
> to:

(1) Disease or insect infestation, unless no
effective control measure exists for such
disease or insect infestation;

.  .  .  .

7 C.F.R. § 457.139, ¶ 11(b)(1).

**(1)  Excess Rain**

The Director noted that while JPM argued on appeal that excess
rain was the cause of the loss, its position was actually more
nuanced.  "Specifically, Appellant contends that a confluence of
weather events, including rain, combined to create conditions
particularly conducive to the development of late blight and Tomato
Yellow Leaf Curl Virus.  Appellant further contends that these
weather patterns rendered ineffective the control measures it
employed to combat the onset and spread of the diseases, ultimately
leading to its crop losses."  (AR 149).  The Director noted that
this argument asserted an <u>indirect</u> relationship between the
weather and the crop losses, which was consistent with factual
testimony from the agency hearing.  (<u>Id.</u>)

The Director found that the circumstances described in the
agency hearing[2] were "too attenuated to qualify for coverage under

---

[2] The Director noted the testimony at the agency hearing
established that excess rain did not directly harm JPM's crops,
but instead indirectly contributed to JPM's crop losses by creating
the environment conducive to the spread of crop disease.  The
testimony was that "a unique combination of rain, dense fog,
humidity, and dew that contributed to the onset and spread of
[L]ate [B]light and [Yellow Leaf] in [JPM's] crops."  (AR 149.)
Petitioner's expert testified it was not simply large amounts of

- 14 -

7 C.F.R. § 457.139, Para. 11(a)(1)." [i.e., as a loss caused by "excess rain"].  (AR 150.)  The Director focused on the Dollar Policy plan's definition of "excess rain," ("[a]n amount of precipitation sufficient to directly damage the crop."  7 C.F.R. § 457.139 Para. 1).  Based on this definition, the Director concluded "it is reasonable for RMA to cover only those claims in which an insured party is able to establish that it suffered crop losses **directly** as a result of excess rain in the absence of any intervening cause that is not identified in the policy."  (AR 150) (emphasis added).  Accordingly, the Director did "not find error in RMA's determination that Appellant's loss claims do not qualify for coverage pursuant to 7 C.F.R. § 457.139, Para. 11(a)."  (Id.)

**(2)  Disease; Effective Control Measure**

Because the claims did not qualify for coverage under the "excess rain" provision, the Director next considered whether the claims qualified under 7 C.F.R. 457.139, paragraph(b)(1).  This policy provision provides:

> (b) In addition to the causes of loss excluded in section 12 of the Basic Provisions, we will not insure against any loss of production due to:
>
> (1) Disease or insect infestation, unless no effective control measure exists for such disease or insect infestation;

---

rain that led to the damage, but the timing and persistence of rain, which contributed to an environment conducive to the spread of disease. (AR 149.)

. . . .

7 C.F.R. § 457.139, ¶ 11(b)(1).  The Director noted that the parties had completely different interpretations of this provision.

The RMA asserted that the meaning of the phrase "unless no effective control measure exists" "is fixed in nature and not dependent on individual circumstances. . . . [O]nce an effective control measure is developed or found for an identified type of disease or insect infestation, it immutably 'exists' within the meaning of the regulations and insurance coverage for such disease or insect infestation is no longer available under the Dollar Plan policy."  (AR 150.)  Petitioner, on the other hand, contended that "the existence of an effective control measure is conditional in nature. . . . [A] control measure that is effective under some circumstance may not be considered effective under other circumstances . . . insurance coverage is available under the Dollar Plan policy in cases in which control measures exist but are proven ineffective based on individual circumstances."  (Id.)

The Director adopted the RMA's interpretation.  The Director was unpersuaded that the rulemaking history supported petitioner's interpretation.  The Director also found that a provision in the Loss Adjustment Manual and the statement made by a RMA representative did not support petitioner's interpretation of the provision because both related to the Guaranteed Production Plan,

not the Dollar Plan at issue in this case. (AR 152-53.)  The
Director found no error in the RMA's determination that
petitioner's loss claims did not qualify for coverage under §
457.139, Para. 11(b)(1).  (AR 153.)  The Director reversed the
Administrative Judge's decision, and reinstated the RMA's decision
denying JPM's indemnity claims because the losses were due to an
ineligible cause of loss.  (<u>Id.</u>)

**E. Petition for Judicial Review**

In its Petition for Judicial Review (Doc. #1), JPM asserts
that the final decision by the Director was unlawful because the
conclusions reached by the Director were arbitrary and capricious,
and the facts were not supported by any competent evidence or
testimony in the record.  More specifically, petitioner asserts
the following errors were made by the Director:  (1) the Director
exceeded his scope of review when he determined (a) "it is
reasonable for RMA to cover only those claims in which an insured
party is able to establish that it suffered crop losses directly
as a result of excess rain in the absence of any intervening cause
that is not identified in the policy," and (b) that excess rain as
defined in the Dollar Plan policy did not cause JPM's crop losses;
and (2) the Director's interpretation of the phrase "unless no
effective control measure exists" contradicts a plain reading of
the provision in the Dollar Plan policy's provision.

**F. Report and Recommendation**

The Magistrate Judge found that that the Director did not exceed his scope of review, and recommended upholding the Director's interpretation of the Dollar Plan policy. Ultimately, the Magistrate Judge recommended that "the final agency decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the Director examined the relevant data, articulated a satisfactory explanation for his decision and came to a rational conclusion." (Doc. #30, p. 27.)

**IV.**

Petitioner raises four specific objections (with sub-arguments) to the Report and Recommendation (Doc. #31). All matters subject to an objection are reviewed *de novo*.

**A. Objections 1 and 2: Scope of Director's Review; "Excess Rain" Determination**

The Court addresses the first two objections by JPM together, since they both relate to the same overarching issue.

The Petition alleges that the Director exceeded the scope of his review authority by determining that excess rain did not cause the crop losses. In recommending a finding that the Director did not exceed his scope of review, the Report and Recommendation states, without objection: "JPM correctly argues the Director did not dispute the AJ's factual findings." (Doc. #30, p. 16.) The Report and Recommendation then continues with the objected-to

sentence:  "Instead, as JPM concedes, the Director considered the legal interpretation of the Dollar Plan policy's provision: whether 'excess rain' as defined in the policy caused JPM's crop losses."  (Id.)

Petitioner objects to this sentence, arguing that the Director did not make a legal interpretation of the policy provision, but rather made independent factual findings not supported by substantial evidence.  Petitioner states that "[t]he uncontradicted, substantial evidence in the record shows that the proximate and primary cause of loss to JPM's tomato crops was excess rain, an insurable cause of loss under the policy," Doc. #31 at 12, and that the Administrative Judge made such a factual finding, id. at 10-11.  JPM argues that the offending sentence in the Report and Recommendation fails to recognize that the Director was improperly making a finding of fact and not a legal interpretation of a policy term.  (Id.)

Similarly, the second objection is to the magistrate judge's recommended finding that "the Director did not exceed his scope of review in deciding that excess rain was not the cause of JPM's crop losses." (Doc. #30, p. 17.)  Again, petitioner asserts that the Director improperly turned a question of fact into a new definition of "excess rain."  (Doc. #31, pp. 13-15.)

Both objections are overruled.  Despite arguments to the contrary, the record establishes that the Administrative Judge did

**not** make a factual finding that the crop losses were caused by "excess rain" within the meaning of the policy. The Director properly accepted the factual determinations of the Administrative Judge, and determined that these circumstances did not qualify as "excess rain" as that phrase is defined in the regulation.

The Administrative Judge began her Appeal Determination by noting that the RMA had denied petitioner's claims based upon its determination that JPM's loses "were due to uninsurable causes of loss; specifically, late blight and Tomato Yellow Leaf Curl (YLC) Virus." (AR 89.) The Administrative Judge then stated that petitioner argued that "late blight and Tomato YLC Virus were secondary to its primary cause of loss of excess rain, which is an insurable cause of loss. Appellant argues that despite its use of control measures, the rainy weather conditions made the virus and disease conducive in spreading over its winter and spring plantings." (Id.) The Administrative Judge stated that the issue before her was "whether the Agency followed its rules and regulation when it denied Appellant's 2015 indemnity claim for losses to its fresh market tomato crop." (AR 90.) The Administrative Judge concluded that the RMA had not done so, and that its adverse decision was "erroneous." (AR 102.)

Other than citing excess rain as a basis for coverage, the Administrative Judge did not cite to the regulatory definition of "excess rain," or discuss its meaning, or state that the facts

fell within the definition. Petitioner relies upon a single sentence in the fourteen page Appeal Determination for its position that the Administrative Judge made a factual finding of "excess rain." To support her finding that the RMA failed to consider all the facts, the Administrative Judge stated: "The Agency dismissed the weather events supported by Appellant's experts showing that excess rain, excess moisture, and other weather events [] came before the onset of disease on Appellant's farm." (AR 97.) But saying that the RMA failed to consider such evidence does not mean the Administrative Judge found the evidence satisfied the Policy definition of "excess rain", or that it caused the loss.

The Administrative Judge found that the agency "erred" in finding the crop losses were caused by disease. Concluding an agency erred in finding disease was the cause is not the equivalent of a finding that excess rain was the cause of the losses. Indeed, the Administrative Judge was precise in her findings, which did not include a finding of excess rain as the direct cause of the crop losses. What the Administrative Judge did find, however, was that disease, made uncontrollable because of rainfall, caused the loss. See (AR 96, ¶ 19) ("Appellant did everything within its control to conquer these problems; however, the combination of disease was overwhelming, and the rainfall was a significant part of this late blight pressure."); (AR 99) ("Appellant responded promptly with the appropriate fungicides to control late blight

but despite this, Appellant was unable to control the disease due to the weather conditions."); (Id.) ("Despite Appellant's efforts, the disease took over and crippled its farm.  Based on the record, the rainy weather conditions made Appellant's use of control measures ineffective causing disease to spread over its tomato crop.").

In the appeal to the Director, JPM again asserted that "excess rain" was the cause of its losses.  The Director properly accepted the findings of the Administrative Judge, looked to the regulatory definition of "excess rain" ("[a]n amount of precipitation sufficient to directly damage the crop," 7 C.F.R. § 457.139, Para. 1.), and concluded that the rain did not directly damage JPM's crop and therefore the loss was not caused by "excess rain" within the meaning of the regulations.  The Director made no error in this regard.

Contrary to JPM's current argument (Doc. #31, pp. 12-13), the Administrative Judge made no finding regarding whether JPM had engaged in recommended farming practices.  Both JPM and the Director had previously noted the lack of such a finding by the Administrative Judge.  (AR 146.)  The Director did not review any such issue, so it formed no part of his determination. (AR 153.)

Petitioner also argues that the Director erred in interpreting the meaning of the term "excess rain" because 7 C.F.R. § 400.768(a) precludes the Director from interpreting terms in a

specific factual situation or case. (Doc. #31, pp. 13-14.) Petitioner is incorrect.

The FCIC has prescribed regulations and criteria "for obtaining a final agency determination of the interpretation of any provision of the Act or the regulations promulgated thereunder." 7 C.F.R. § 400.765(a). A requester submits a written request which comports with certain requirements. 7 C.F.R. § 400.767. "Requesters may seek interpretations of those provisions of the Act and the regulations promulgated thereunder that are in effect for the crop year in which the request under this subpart is being made and the three previous crop years." 7 C.F.R. § 400.765(b). "All final agency determinations issued by FCIC, and published in accordance with § 400.768(f), will be binding on all participants in the Federal crop insurance program." 7 C.F.R. § 400.765(c). The FCIC, however, "will not interpret any specific factual situation or case." 7 C.F.R. § 400.768(a). JPM did not make any such request, and this case does not involve any such request, so these regulations are simply inapplicable. See Davis v. Producers Agric. Ins. Co., 762 F.3d at 1284-85.

In contrast, the administrative appeal process of an agency decision contains no such restrictions, and indeed requires specific determinations by the Director when acting in his appellate capacity reviewing a decision by an Administrative Judge. "In making a determination on the appeal, Hearing Officers

and the Director shall ensure that the decision is consistent with the laws and regulations of the agency, and with the generally applicable interpretations of such laws and regulations." 7 C.F.R. § 11.10(b).

Petitioner also argues the Director inserted an arbitrary quantitative measure into his interpretation of "excess rain". (Doc. #31, p. 14.) This is incorrect. The Director's determination makes no reference to a quantitative amount which is necessary for rain to be "excess", but instead focuses on the "directly" requirement of the regulatory definition.

Petitioner further argues that the record does not support the Director's statement that the RMA representative was confusing the Dollar Plan policy with the Guaranteed Production Plan. (Doc. # 31, p. 15.) The Court finds that the Director's discussion of the Guaranteed Production Plan (AR 152-53) was supported by the administrative record, and reasonable inferences from the record.

Finally, petitioner argues that the Report and Recommendation's position that an employee or loss adjustor cannot waive or modify the terms of the policy does not address the value or circumstance of their comment, which both persons felt was important enough to memorialize in a report. At the least, petitioner argues, the comment is indicative of the indemnity history of the Dollar Plan policy archived on the RMA website. (Doc. #31, p. 15.)

The statements in the Report and Recommendation are correct. The opinions of employees or adjustors as to the meaning of regulations are neither binding upon the agency nor relevant to an inquiry as to the legal meaning of a regulation. _Federal Crop Ins. Corp. v. Merrill_, 332 U.S. 380 (1947); _OPM v. Richmond_, 496 U.S. 414 (1990). Neither had the authority to speak authoritatively as to the meaning of the regulations, and neither's opinion is material to the indemnity history of the Dollar Plan policy. The opinions have no value towards the proper interpretation of the regulation or its reasonableness.

After _de novo_ review, the Court overrules all objections and arguments in Objections 1 and 2. The Appeal Determination of the Director holding that the crop losses were not caused by "excess rain" within the meaning of the regulation is affirmed.

### B. Objections 3 and 4: Agency Interpretation of "No Effective Control Measure Exists" Regulation; Loss Adjustment Manual

Both Objection 3 and 4 relate to the Director's interpretation of the phrase "no effective control measure exists" as it pertains to disease as a cause of loss. Petitioner contends that the Director's interpretation violates the plain meaning of the regulation and that the Director made a variety of errors in reaching his position.

The regulation at issue provides:

> (b) In addition to the causes of loss excluded
> in section 12 of the Basic Provisions, we will

> not insure against any loss of production due
> to:
>
> (1) Disease or insect infestation, unless no
> effective control measure exists for such
> disease or insect infestation;

    . . . .

7 C.F.R. § 457.139, ¶ 11(b)(1).  Phrased in the affirmative, the

Dollar Plan policy will insure against any loss of production due

to disease or insect infestation for which no effective control

measure exists.  Identical provisions exist for fresh market

pepper crops, 7 C.F.R. § 457.148, Para. 11(b)(1), and nursery

crops, 7 C.F.R. § 457.162, Para. 11(b)(1).  Because this

regulation was issued utilizing the "notice-and-comment"

procedure, it has the force and effect of law.  <u>Perez v. Mortgage

Bankers Ass'n</u>, 135 S. Ct. 1199, 1203 (2015).

Unlike the "excess rain" regulation, the phrase "no effective

control measure exists" is not further defined in the regulation.

The Director adopted the agency position that the phrase "no

effective control measure exists" was "fixed in nature and not

dependent on individual circumstances. . . . once an effective

control measure is developed or found for an identified type of

disease or insect infestation, it immutably 'exists' within the

meaning of the regulations and insurance coverage for such disease

or insect infestation is no longer available under the Dollar Plan

policy."  (AR 150.)  Finding it undisputed that late blight and

Tomato Yellow Leaf Curl Virus were not new diseases and were well-understood diseases that can be controlled with available chemicals (AR 151), the Director found there was no covered loss under the disease provision of the Dollar Plan policy.

As the Magistrate Judge correctly stated, the Director held that "once an effective control measure for a type of disease or insect infestation is developed, such disease or insect infestation no longer qualifies for coverage under this provision." (Doc. #30, p. 18.) Petitioner objects to the Magistrate Judge's recommendation to uphold the Director's interpretation of this portion of the Dollar Plan policy regulation.

Petitioner objects to the Magistrate Judge's statement that the "issue here is the agency's interpretation of its own regulations, not a question of insurance contract interpretation as characterized by JPM." (Doc. #30, p. 21; Doc. #31, p. 15.) The objected-to sentence in the Report and Recommendation is quite accurate. The Dollar Plan policy is not the usual contract subject to the usual rules of contract construction. Rather, it is an agreement whose terms are largely mandated by federal regulation, and it is the meaning of two such regulations which is at the heart of this case. By law, state or local laws or rules do not apply to the extent they are inconsistent with the regulations of the FCIC. 7 U.S.C. § 1506(l). Petitioner's objection to this

sentence in the Report and Recommendation is overruled.  The issue is indeed the propriety of the agency's interpretation of its own regulation.

To determine the meaning of a regulation, the first step is to determine whether the language "has a plain and unambiguous meaning by referring to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Sec. & Exch. Comm'n v. Levin, 849 F.3d 995, 1003 (11th Cir. 2017).  If the regulation's meaning is plain and unambiguous, there is no need for further inquiry. Id.

The Court concludes that the meaning of the phrase "no effective control measure exists" is not plain and unambiguous. Both sides have proffered competing meanings which are plausible, but not compelled, by the language of the regulation.  The regulation provides no further definition, the text itself provides no more definitive reading, the context of the phrase does not point to a plain meaning, and the broader context of the regulation, and the similar regulations in which the phrase is used, do not compel any particular meaning.

When a regulation is ambiguous, the agency's interpretation of its own regulation is entitled to deference. Auer v. Robbins, 519 U.S. 452, 461 (1997)); Sec'y, United States DOL v. Action Elec. Co., 868 F.3d 1324, 1329 (11th Cir. 2017). "In situations in which the meaning of [regulatory] language is not free from doubt, the

reviewing court should give effect to the agency's interpretation so long as it is 'reasonable,' that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 149-51 (1991) (internal citations omitted). "It is well established that an agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail." Decker v. Northwest Envtl. Def. Ctr., 568 U.S. 597, 613 (2013).

The agency has not interpreted the regulation in a legislative rule after notice-and-comment procedures, and has not issued an interpretative rule, i.e., a rule "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." Perez, 135 S. Ct. at 1204 (citation omitted). Obviously, no deference is due to nonexistent interpretations. But deference is generally due to an agency's interpretation of a regulation made during an administrative proceeding, Martin, 499 U.S. at 157; Action Elec. Co., 868 F.3d at 1331. Here, it is clear from the record that during the administrative process the agency advanced the interpretation of the regulation ultimately adopted by the Director. Indeed, petitioner accurately summarized the agency's position in its appeal request to the Director: "The Agency argues that once a control measure is deemed to be effective for (in this case) white

fly transmitted tomato yellow leaf curling virus and/or late blight in any given year, then white fly transmitted tomato yellow leaf curling virus and/or late blight can never, under any circumstances be an insured cause of loss." (AR 123.)

The Court concludes that the RMA's interpretation of this regulation is reasonable because it sensibly conforms to the purpose and wording of the regulation. While not the only possible interpretation, it is a reasonable interpretation, and therefore defining the phrase in the manner found by the Director is affirmed.

The Director relied primarily on the regulatory history for this particular regulation, addressing an amendment promulgated in 1996-97. As the Report and Recommendation accurately summarizes,

> . . . On December 30, 1996, the FCIC proposed specific crop provisions for the Dollar Plan policy, which excluded coverage for disease or insect infestation. Dollar Plan Provisions, 61 Fed. Reg. 68,682-01, 68,686 (proposed Dec. 30, 1996). In response to this proposed rule, the crop insurance industry submitted one comment seeking to remove disease and insect infestation as uninsured causes of loss. Dollar Plan Provisions, 62 Fed. Reg. at 14,777.

> The industry "suggested disease and insects should be an insured cause of loss if a producer exhausts all reasonable means to protect the crop. This would provide coverage for new diseases and insects that cannot presently be controlled by the chemicals that are available." Id. The FCIC responded "coverage should be available for damage due to disease and insect infestation for which no

> effective control measure exists." Id.
> Accordingly, the FCIC amended the proposed
> provision to state that disease or insect
> infestation is not covered, unless "no
> effective control measure exists for such
> disease or insect infestation." Id.; see 7
> C.F.R. § 457.139.

(Doc. #30, pp. 18-19.) As the Magistrate Judge correctly stated: "The Director found this history does not support JPM's position that the provision is designed to cover 'a loss caused by a disease for which available chemicals were not effective due to specific weather conditions.'" (Id. p. 19.) The Director made a fair reading of the relatively sparse regulatory history.

Deference to an agency's interpretation of its own ambiguous regulation, however, is not always warranted. No deference is justified, for example, when the interpretation is "plainly erroneous or inconsistent with the regulation", "there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question," when the interpretation conflicts with a prior interpretation, or the interpretation is nothing more than a "convenient litigating position" or a "*post hoc* rationalization." Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 154-55 (2012) (citations omitted.)

Petitioner makes several arguments as to the interpretation and the reasonableness of the agency's (and the Director's) interpretation. Petitioner argues that the Director's

interpretation is undermined by payment data in the agency's own website, which shows payments for disease and insect infestation causes of loss. Petitioner asserts that the administrative record establishes that 175 indemnities were paid in the region from 2004 through 2016 under the same policy, and 45 indemnities were paid for losses caused by disease and insects (i.e., over 25%). (Doc. #31, pp. 15-20.) Petitioner argues that this payment history suggests "a post-hoc contrived rationale for the denial" of its claims, which undermines the validity and reasonableness of the agency's interpretation of its regulation, and does not "reflect the agency's fair and considered judgment on the matter in question." (Doc. #31, p. 19) (quoting Talk Am, Inc. v. Mich. Bell Tel Co., 564 U.S. 50, 59 (2011)).

There are several problems with this argument. First, the Dollar Plan policy at issue here was only effective for the 2013 and succeeding crop years. 7 C.F.R. § 457.139. Thus, data from 2004 through parts of 2012 cannot literally be for the same policy. Second, the data reflect payments made by private insurance companies, which were reported to the MRA using codes which did not identify the specific disease at issue and did not distinguish between disease loss and insect infestation loss. Thus, there is no record evidence that a private insurance company paid for the two diseases at issue in this case at a time when the diseases were effectively controlled. Additionally, even such payments

would not necessarily establish that the Director's interpretation of the regulation was erroneous, only that a claim was erroneously paid by a private insurer without discovery or remediation by the RMA.

Petitioner also argues that this payment history is inconsistent the FCIC's obligation to establish standards "to ensure that all claims for losses are adjusted, to the extent practicable, in a uniform and timely manner." 7 U.S.C. § 1508(j). Petitioner asserts that the RMA's refusal to acknowledge the payment history summarized above is capricious and a violation of FCIA. As discussed above, however, the payment history record is not such that the decision by the Director is rendered capricious or a violation of FCIA.

Petitioner also objects to the Report and Recommendation's endorsement of the Director's position that paragraph 281A of the Loss Adjustment Manual (LAM) does not apply to the Dollar Plan, asserting that the Director's position is not supported by substantial evidence. Petitioner argues that the Manual itself and a cross-reference to the Loss Adjustment Standards Handbook demonstrates that the Director's interpretation was erroneous and that the LAM was applicable to the Dollar Plan policy. Petitioner asserts that the Director's position that the LAM paragraph did not apply to the Dollar Plan was the cornerstone of his erroneous interpretation of the regulation. (Doc. #31, pp. 20-22.)

What governs this case is the regulation, not an internal manual. The Director did not interpret the meaning of the Loss Adjustment Manual, but rather determined its (non)applicability to the Dollar Plan. Further, the decision to ignore petitioner's interpretation of the Loss Adjustment Manual and its application is consistent with guidance from the Loss Adjustment Manual itself, which specifically provides that the Dollar Plan takes precedence over the Loss Adjustment Manual. (Doc. #36, p. 5.)

After a careful and complete *de novo* review of the findings and recommendations, the Court adopts as set forth above the Report and Recommendation of the magistrate judge and overrules the objections. For the reasons set forth above, the Director Review Determination is affirmed.

Accordingly, it is now

**ORDERED:**

1. The Report and Recommendation (Doc. #30) is hereby **adopted** and incorporated herein to the extent set forth above.

2. Petitioner's Rule 72(b) Objections (Doc. #31) are **overruled**.

3. Petitioner's Request for Oral Argument (Doc. #22) is **denied** as the Court finds that oral argument is not warranted, and a decision can be made on the papers.

4. Petitioner's Motion for Summary Judgment (Doc. #22) is **denied.**

5. Respondent's Cross-Motion to Uphold the RMA's Final Agency Determination (Doc. #26) is **granted**.

6. The Clerk shall enter judgment in favor of respondent and against petitioner affirming the Director Review Determination, terminate all pending motions and deadlines, and close the file.

**DONE and ORDERED** at Fort Myers, Florida, this __6th__ day of March, 2018.

_John E. Steele_
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Hon. Carol Mirando
All Parties of Record